May it please the Court, I am going to perhaps reserve as much as five minutes for rebuttal. In the meantime, I want to devote most of my remarks to where the briefing was, the defamation count. But I do want to point out to the Court that defamation was count six of a seven-count complaint at the time it was filed, and that was not an accident. The contract claims are very much freestanding claims. I do not think they are dismissed if the defamation is, nor is the false light invasion of privacy. Under section 652D of the restatement, which Iowa recognizes as controlling, the key question is do we have a public communication of private false facts? There is no question, I think, no reasonable question that at summary judgment Mr. Hagar's screed had to be taken as false. I think there is also very little doubt that 280,000 copies of a book counts as a public communication by virtually anybody's reckoning. The question becomes does the fact on our false light claim, the question becomes does the fact that not everyone who bought the book or who read it could recognize Ms. Doe without assistance or without knowing extraneous facts means that somehow we no longer have a public communication? One question. Yes, Your Honor. If I understand it right, while she, while Jane Doe distributed and told people about the book and there were other people that read it and they knew about Jane Doe, but wasn't there in the record at least one person who tied Jane Doe to the person mentioned in the book, in the record? There was indeed, Your Honor. Isn't that under the law enough for publication? It certainly is for defamation, Your Honor, yes. In the connection with the defamation count. In fact, I think we have at least three individuals. We have Francine Rosich who at page 130, excuse me, on the record, it's page 1096 of the record. When you talked about it as being her, who was the first person in the conversation to say that they thought the book referred to Ms. Shepard? And Ms. Rosich's answer was in substance, oh, I knew it was her. When I read it in the bookstore. The other question I wanted to ask you or certainly reach is, what makes a prima facie case of defamation or prima facie, I guess it's prima facie libel? I think for libel per se, Your Honor. I mean libel per se, yeah. For libel generally or for libel per se? Libel per se. For libel per se, Your Honor, I think we have all of the elements of libel, which is to say the publication of a defamatory, defamatory being a term of art here, statement about which is often concerning, another term of art, the individual, which harms the individual in her profession or which attacks her character in a fundamental way. And that last element, obviously, I'm paraphrasing. But for example, when a person is described as she was here as an extortionist, we have a case called Rees v. O'Malley, which is right on point in Iowa, which tells us that a charge of extortion is libel per se. Mr. Hager used that word three times in that five paragraphs in connection with her and, in fact, invented a whole series of facts to document that charge. This wasn't simply a vague, generalized statement. There were actual events leading up to the extortion, and there was a subsequent payment of money as a result of it. So I think the real question here is, was it libel per se? Mr. Hager's primary defense, I believe, is, well, you couldn't recognize it as her. As Your Honor has accurately pointed out, we have at least three people on the record who recognized it as her. We have Rosich, we have Harms, and I think we have Lauser and one of her other friends as well, whose name isn't jumping out at me. Did all of those people have prior knowledge gained from Jane Doe? None of them did, Your Honor. None of them did. Ms. Rosich recognized the book. Now, mind you, there's some equivocal testimony under cross-examination. Did Ms. Rosich recant what I just read to you a moment ago? It is equivocal. I will acknowledge that. But for purposes of summary judgment, that needs to be resolved for Ms. Doe. So you're saying all three were able to figure it out just from the book? Well, no. At least one of them, I believe Mr. Lauser, who was a member of Hager's band, heard about it directly either from Mr. Kinnear or a private investigator who put it in front of her, put it in front of him, and basically let him know. But we have Ms. Rosich, who was able to figure it out, and we have Ms. Daniels. Here's what she said at page 874 of the record. When you were sitting in the bookstore, you found the references to Ms. Doe. Is that right? Yes. Question, what had she told you about the references before you went to Barnes & Noble? Answer, she didn't. So she looked suited Barnes & Noble. And mind you, Your Honors, part of the issue here is that the district court went down the wrong road. Wait a minute. Yes. What did she know about, it doesn't matter whether Ms. Doe told her, what did she know about Ms. Doe when she went to Barnes & Noble? She knew Ms. Doe. Okay. So she had the background knowledge. It doesn't matter that she was fed it by Ms. Doe before she went to Barnes & Noble. She wasn't fed it by Ms. Doe. No, she wasn't. She had it. She had it. That would explain it. Yes. No, I think that Judge Gruner is quite correct. And I think part of the problem here, Your Honors, is that the district court fundamentally went down the wrong road. It took the interrogatories, which we understood to be damages interrogatories. Who knows who has heard about this? Tell us the names of these people. And we listed them, and Hager went out and deposed them and said, well, see, these people didn't really recognize her. But the question isn't, can we adduce somebody who recognized her? Because there are 288-something thousand copies of this book that has been circulated. People in New York knew about this affair. People in Lansing, where they had the affair, knew about it. People in Iowa know about it. She has an 11-year-old daughter who's going to hear about this someday, because that book is libel. Libel doesn't go away. It's not like slander. The book is forever. Well, it seems to me the issue is, if the only people who could identify Ms. Doe from this book were those with prior extrinsic knowledge, does that satisfy the requirements of libel per se? It does, Your Honor. You don't have, you've told me some cases to read, and, I mean, certainly the district court properly distinguished Bierman on that ground. Well, I'm... So how many, you know, what do we have here? If we have a handful of people, large or small hand, who by reason of living through the It doesn't have the same intuitive or innate defamatory impact which is required for libel per se to me. I mean, it's just trying to reason through it. No, I see what the court is saying, but I would submit to you two things. First of all, that is the nature of libel. We don't know where it goes. We don't know what the impact has been. We don't, and Ms. Doe is in no position to say what it was, and that's why there is a rule of libel per se. To make her show damages in order to show that she doesn't have, to avail herself of a rule that shows she doesn't have to show damages... That has to be of and about a person. Of and concern, yes. If there was the most libelous fiction under the sun, the fact that somebody could say, well, that's me. I know me, and I've got four of my friends who, growing up, who would know that that describes me perfectly, that's not libel per se, is it? Well, yes, I think it is, Your Honor. There is no question that of and concerning under Iowa law, this is cut and dry. This is very clear. Of and concerning under Iowa law means if the person was intended. If you are the target, then it is of and concerning you. She was the target. The second issue is, was it published? If even one person saw it, and we have a recent case that I cited to you in the brief from the Iowa Appeals Court, in which literally one co-worker saw it, that is sufficient publication. Mr. Hager's hypothesis is that in libel per se, there is a higher, greater requirement than just of and concerning and publication, and that somehow it can be found in the rules of libel per se. Our response to this is, first of all, no, it isn't to be found anywhere. Secondly, to the extent that they purport to find it, they find it in the language of cases which are far away from this case. Not close like Bierman, but far away. I would also point out that as to Bierman, the district court below distinguished it on the grounds that, well, you could tell from the publication itself who they were talking about. But that's not the basis that the Iowa Supreme Court decided the case on. What the Iowa Supreme Court held is that if it's of and concerning, that's good enough for libel per se. That's the rule of law that the court stated. The fact that it chose to state it in connection with facts which are at some level distinguishable from this one doesn't mean that that's not the rule of law. We would have no rules of law if that were the case, because every case is in some degree factually distinguishable. I think you also have the Shaw Cleaners and Dyers case, in which half-price cleaners were assailed in a newspaper advertisement. I don't read Bierman as being that broad. In the passage in question, in the preceding 19 pages, only two women are discussed, and they were specifically identified. As the district court found, it does not take speculation or guesswork to put two and two together from the work. But that's not—there's no speculation or guesswork required from Ms. Doe, either. What you need to do in Bierman is to— If you have the extrinsic knowledge. But the extrinsic knowledge is gained from Bierman, from the book itself, but not from the same passage. In Shaw Cleaners and Dyers, the extrinsic knowledge is gained from the same publication, but weeks or months prior. But these rules make no sense if that is the libel per se rule. Well, they make sense to me, because if it's in the same publication or elsewhere in the same work, the libeler knows that. Whereas if the person who—intentional, well, the intent has to be the libel. But if you write something fictionally, which it can only be linked to a specific person from outside your work, you're not the same level of intentional wrongdoer. And libel per se is a highly criticized and in many jurisdictions flat-out rejected concept. And in many jurisdictions flat-out adopted. Libel per quad has what's been rejected. In the state of Massachusetts, all libel is libel per se. Bierman took pages to talk about whether to retain libel per se. It did, Your Honor. In my jurisdiction. That's what I'm going on about. And that's the policy of the Iowa courts to recognize libel per se as a valid and valuable cause of action. That doesn't speak to how extensively or expansively you should apply it. Well, Your Honor, I think that—let me submit to you, and I see most of my rebuttal time is wasting away, but let me submit to you that if someone libels Your Honor, the libel is going to affect Your Honor's reputation among the people who know you. Among the people who don't know you, it doesn't matter if your reputation is affected. This libel affected Ms. Doe in the community in which she lives. The people who know her, their family, her friends. This brought up— But if you really knew, you would take the word extortion, which you're saying is what makes it defamatory per se. You would know that was an exaggeration or fabrication. Not necessarily, but Your Honor, again, now we are in the position of making us prove that other people believed it. Who is going to come in and testify? Is her sister going to say, oh my God, I thought she was an extortionist? Does that mean that her esteem hasn't been lowered in those eyes? What about all the other people we can't find? How on earth can we possibly measure the effect of this on the people that we don't know and can't find? The doctrine of libel per se goes to the kind of words you speak. If you are going to say something that would, in King Alfred's time, have gotten your tongue cut out, then you must either stand by it and be ready to prove that it's the truth or you shouldn't say it in the first place. That's the responsible speech clause of the Iowa Constitution. That's the fundamental policy that Bierman recognized, and that's why this is consistent with that case. And now I seem to have no rebuttal time at all, but thank you very much for your attention. Mr. Kinnear? May it please the Court, Wesley Kinnear for Defendant Napoli Sammy Hagar. This is a manufactured defamation claim with no harmed reputation or any other kind of damages. It depends entirely on the plaintiff's invoking the extraordinary per se presumptions that are important to the plaintiff to leave her from proving almost anything. There's no reason in this case to presume that plaintiff's reputation was harmed, and there's every reason to conclude that her reputation was not harmed. To get immediately to Judge Bright's question, this is a case where the book does not identify the plaintiff, so the plaintiff herself took steps to make sure that at least a few people believe that she was mentioned in the book. She read the book aloud to a few friends and family who had never seen it. But I think you've got to answer the question. For me, that was raised as that one to three people who read the book attributed those statements about extortion and having the baby and the rest of it to Jane Doe as they knew her. I'll speak directly to that then, Your Honor. The counsel mentioned Francine Rosich. As the record shows, and it's not equivocal, Francine Rosich testified that she heard about the book, did not read the book, called up Doe, said, I heard about this book, I haven't read it, and Doe, by the way, confirms all of this, and said, are you in it? And Doe said yes, and gave her the two-page numbers. After that, Ms. Rosich went to the bookstore, found the two pages, and read it. That's Doe publishing the book to Ms. Rosich. Well, here's the problem, one of the problems I have. You have, in this case, over 200 copies sold at that time. And you know, somebody publishes a book, has defamatory statements about somebody, which people who knew that somebody could identify her. And I think anybody who knew Jane Doe and knew of the relationship, that's the important thing, would attribute this to Jane Doe. So what you're saying, if I get it, is that the author of the defamation statement, unless the plaintiff can prove somebody got it right now, can't have a claim of damages. No, Your Honor, that's not what I'm claiming. She could have a claim of damages if she proved that. The question before this Court is instead, does she get the extraordinary per se presumptions that presume falsity, harm, malice, fault, all of those things? That's the issue here. It's not whether she has some other kind of claim, it's whether she gets the benefit of that. Because recognize, without that presumption, she has no claim, because there are no damages at all. There's no harmed reputation, there's nothing. So to speak to the people we're talking about, in each case, and we actually provided a table in the briefing, Doe herself went to these people, in most cases right before their deposition. They'd never heard of the book, and she read it to them aloud. Counsel also mentions Jesse Harms and David Lauser. These are people who learned of the book and that Doe was mentioned in the book only because of the lawsuit. This happened after the lawsuit was filed, and we had to defend the lawsuit, we interviewed these people to find out what they knew, and of course in the course of that interview, they have to learn who it is. Now there's two things about that that say that you can't use those people. You're overstating the impact of reversing here, because as I read Behrman, you still have all your defenses. We're talking about whether this is a prima facie case. Your Honor, we have... You still have truth and so forth. You do. In this case, you're talking about the truth of what happened 25 years ago, which is difficult, particularly since many of the key players have now passed on. I mean, you've overstated this. She wants to win without having to prove anything. That's not really, that's not the way I read Behrman. Well, I think I would disagree only in this sense. It's critical to her case. However, if the court reversed and sent it back for consideration of the other reasons why she loses, we still have a defense. That is true. That is certainly true. I could go through and address the other people, but to focus on, and we addressed this in the papers too, the evidence is not equivocal about how these people learned about the book. I will also point out... Let me ask you this way, though. Wouldn't there have been people back then who were aware of their relationship, band members, staff, that sort of thing, who could then put two and two together? It's possible, Your Honor, but that's again when we come back to the per se question. The courts in Iowa will not impose the per se presumptions unless they can conclude from the words of the book alone, and what the Iowa court says is unambiguously, without speculation and guesswork. And we would be guessing whether people actually knew if they read the book and whether they made the connection. You're speculating about all those things. And that's why you can't impose the per se presumptions, which impose strict liability on free speech. They're extraordinary, and that's why you have this hurdle. I did want to respond to a statement that counsel made that in order to prove that the plaintiff has to show is that she was the intended target. We know that's not true. Brummett says that's not true. The court's obviously familiar with the decision. Brummett very specifically says even if the plaintiff is the intended target, it's not of them concerning that person unless they put on evidence that somebody actually understood that they were the person referenced. So it's not enough to say they were intended. Brummett says that. The restatement says that. That's very clear. I wanted to correct that misstatement. Responding to Judge Loken's comment that wouldn't the people who already knew about all this from plaintiff, and that really is the peculiar characteristic of the case, is that the only people who can recognize plaintiff are people who already know the story. In fact, they know much, much more of the story than the book ever tells. And yes, would they know that this was a fabrication, that these statements were rhetorical hyperbole, these were rock and roll singer making extravagant statements? Yes. And in fact, they all did. They all did. None of them believed this. They all said they didn't believe any of these things about her. They heard the story. They immediately rejected it. Now, as I say, the people that she relies on all learned about the book from her. What it comes back to is that this case is actually at base a simple case that does not implicate the sometimes tangled history of defamation law. The question for the trial court was whether or not it was required to impose the paracet presumptions. And the trial court concluded that it was not required to do so because under Iowa law, you don't impose those presumptions unless the court can conclude as a matter of law unambiguously without speculation or guesswork from the words alone of the book that they will expose the plaintiff's reputation to harm. Let me ask you this question. Suppose in a case, I'll say this case, a person knows that it's been written about in a book and says to 10 people, without saying what's in the book, you know, I've been written about in a book by John Doe or John something or other, we won't use the term Doe, John Jones. And so the person goes and reads the book, buys the book, by gosh, the person says, huh, that has to do with Miss Lonely Pops. Is that enough? Would that be enough to meet the publication element? Is that the court's question? Would that count as a publication and not run into the self-defamation problem? I think in that... Both publication and fit libel per se. Well, the hypothetical doesn't really address the paracet issue, but it addresses the publication issue, which is, has the book actually been published to somebody who understands it? Because publication requires that a third party not just read the book, but understand it. And that, again, that's what Hugerich says, for example. And in your case, we don't know how exactly that played out. But to follow your example forward, I think in that case, you still have a case where the plaintiff himself or herself has communicated the book to the audience with hints. Or in this case, what happened was that the plaintiff called people up and read them the paragraphs or opened it up and pointed to the pages. Let me ask you, are you sure that it has to be limited to just the book? Let's suppose in 1980, when they had the relationship, the front page of Rolling Stone said, Jane Doe is dating Playboy Bunny. Jane Doe is dating Sammy Hagar. And then this popped out. Wouldn't that be enough? I think that the expanse of time makes that a difficult question between 1980 and today. What the Iowa courts say repeatedly, and it's not that different from other places, is that you have to be able to know from the book alone that the book alone, the words of the book alone will harm the plaintiff's reputation. Well, then you get to a situation where, and I don't know about the Rolling Stone, I don't read it, but maybe it's common knowledge. And if we assumed that the facts that were in the book were common knowledge, which I think is what your hypothetical gets to, is that if we assume that these facts were common knowledge and everybody knows that Jane Doe was dating Sammy Hagar and this must be it, I think that that'd be a close question. I think that'd be a very close question. And in fact, you could find that she was identified because that's common knowledge. But this is not common knowledge. Does that answer the court's question? Yeah, I think so. But I think Shaw Cleaners didn't involve one newspaper article. It said, I thought, that you could figure it out from prior newspaper articles. I'm glad the court mentioned Shaw. There's two things about that. First of all, the court said, not a parasite case. So that distinguishes it from this. The other thing is that, and it gets lost sometimes because of the language of the case, is that in that case, the plaintiff's ads and the defendant's ads appeared in the same issues, not just prior weeks. And we've cited that in our papers, the citation as well. It appeared in both places. Now, the court didn't actually have to get to that because it's not a parasite case. What the court also does, though, and it's the language, the plaintiff's site from Shaw, but that language is actually from the Overstreet case where you have the same circumstance where the particular article didn't name the plaintiff, but other places in the same newspaper did. And that's the Bierman case, where the particular challenged passages didn't name the plaintiff, but the rest of the book did. And that still meets the basic Iowa test, which is, can you tell from the book alone, from the words alone, who we're talking about? And can you tell from the book alone, from the words alone, that it'll harm the plaintiff's reputation? So it meets that as well. Can I ask you about the breach of contract claim, to digress for a second? When Mr. Hagar says, essentially, I was being extorted, isn't he saying I was paying her to be silent? And therefore, isn't he disclosing a term of the agreement? I think that that's rather a reach, Your Honor, because first of all, I think extortion is, it's the same word I hear whenever my clients get sued by anybody. It's just, they're upset, I've been threatened, I have to pay money. And what we do know from the evidence is that Jane Doe said, pay me money or I'm going to sue you. That's what we know. And we also know from the passage, nowhere in the passage does it mention, not only an agreement, it doesn't say that Jane Doe agreed to anything. All we know is that he gave her some money and he was upset about it. So with respect, I think it's rather a reach because we don't know, even if you took the word extort, literally, what the threat was. So I don't, I think it's rather a reach to say that the quid pro quo is being spelled out. Well, I wonder even if you have to have the quid pro quo, the fact that he's paying money is a term. He did pay money. However, what the agreement says is that, you can't disclose that there was an agreement. An agreement requires people to agree about something and there's nothing there about that. And likewise, as Jane Doe herself said, the book does not say that she was required to keep his paternity confidential. And she's explicit about that. We've cited the testimony in our brief. She herself concedes that the book doesn't say that or doesn't imply that. So yes, that is, he paid her money, but he doesn't say he paid her money as part of a deal or as part of a contract or that she agreed to do anything in return. All things that are required for a contract. So I think the district court was correct in saying that. Second of all, as the district court points out, the only people who could know that this is what the book was talking about already knew. And it can't be a breach of confidentiality to tell people something that they already know. My time is running down. So if the court has other questions, I'd be glad to answer them. What's the other, what's the difference, whether it's a libel per se or libel per code? What would be the difference? There's a major difference, Your Honor. In ordinary cases, a plaintiff has to prove that a libelous statement was made. It was defamatory. It was false. It was published. It was other content. And also that it caused harm to reputation. That's the CNA quantum. However, if it's libel per se, many of those requirements are gone. And harm is presumptively, or excuse me, is conclusively presumed. So that harm is conclusively presumed in a per se case. Yes, but not. But otherwise, you have to prove it. If you can, at that point, prove other kinds of damages. That's true. However, the court in Iowa, the jury in Iowa, can award substantial damages at that point. Likewise, falsity is presumed. It would become our burden to prove the facts of what really happened 25 years ago. So that's a major difference. And in this case, the difference is that since plaintiff has no harm, no damages, she has no case. Thank you, Your Honor. Thank you. I'll give you a minute for rebuttal. Thank you. Some inside baseball. Brummett was a class defamation case. This is one of the issues I think we have here with this whole defamation problem, which is that Mr. Hager is taking doctrines and putting them in places where they don't belong. Settled common law doctrines. Brummett was a class defamation case in which union members were assailed, and particular union members said, that reflects badly on me. And this court, understandably, looked to the particular restatement section that governs class defamation, which doesn't apply here. Jane Doe is a member of a class of one. She's the only playboy bunny Hager ever impregnated. The other point that I wanted to make very briefly involved the claim of the extraordinary per se presumptions. The per se presumptions are the ordinary presumptions that existed for 200 years of common law. A class of one, that's a little facile. I mean, the reader wouldn't necessarily know that, and the reader wouldn't assume in this kind of work that it was true, even if he said it. But your honor, when one talks about union members, one is obviously talking about a group of individuals. This was not about a group at all. This was about one particular individual. Whether you could figure out who it was is a separate issue. We're talking about of and concerning. Thank you, your honor. The case has been well briefed and argued, and raises interesting, important issues. We'll take it under advisement.